# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES E. MEYER,<br>　　　　Plaintiff, | CIVIL ACTION |
| v. | |
| DELAWARE VALLEY LIFT TRUCK, INC., *et al.*,<br>　　　　Defendants. | NO. 18-1118 |

## MEMORANDUM OPINION

This case involves a family business that, for years, was amicably owned and operated by two brothers, Plaintiff James E. Meyer ("Jim") and Defendant John W. Meyer ("Jack"). Then things turned sour. One brother, Jack, ousted the other brother, Jim, giving rise to this suit by Jim against Jack, the company, and the law firm retained in connection with the ouster. Now pending are the parties' cross motions for summary judgment.

## I.　BACKGROUND

The details of this dispute remain hotly contested, but the essential facts are these. Defendant Delaware Valley Lift Truck, Inc. ("DVLT") is a closely-held corporation that sells, rents, and services forklifts and material handling equipment. Jack and Jim's father, John C. Meyer ("John Sr."), founded the business in 1985. Jack began working for his father that same year. Jim joined in or around 1997 as a service and rental manager. At that time, John Sr. was DVLT's sole shareholder, holding 1000 shares. In 1999, John Sr. gave Jack and Jim 100 shares each. By 2005, each brother had a 50% interest in DVLT.

The business was successful: In 2006, Jack and John Sr. purchased property for DVLT's expanding operations, which they leased to the company for $10,000 per month. Around this time (the parties dispute the exact date), Herbert Fineburg was hired to serve as DVLT's

corporate counsel.  In an effort to improve the company's corporate governance documents, Fineburg prepared an interim shareholders' agreement which was executed by Jack, Jim, and John Sr. in August of 2007.

On February 1, 2008, Jack and Jim entered into a new shareholders' agreement (the "Shareholders' Agreement" or "Agreement"), the terms of which form the heart of the present dispute.  The Agreement identifies Jack, Jim, and John Sr. as DVLT's Board of Directors, and names Jack as DVLT's President and Jim as DVLT's Secretary/Treasurer.  Most relevant here, Paragraph 26 of the Agreement requires that all "major decisions of the Corporation shall require [the] unanimous consent" of Jack and Jim and, should the brothers fail to agree on a major decision, provides the following procedure for resolving the deadlock:

> In the event of a disagreement between the Shareholders that cannot be resolved, the Shareholders agree that [John Sr.], who may consult with Don Fork, shall resolve such disagreement.  In the event [John Sr.] is unavailable in the event of disagreement, Don Fork shall resolve such disagreement; otherwise, arbitration under Paragraph 23 hereof shall control.

The Agreement contains no other guidance for resolving shareholder disputes.

Although the brothers were apparently adept, for a time, at working together to resolve any differences of opinion, a series of events would bring the Agreement's dispute resolution provision front and center.  In early 2016, Jack was diagnosed with kidney cancer, requiring extensive treatment.  To help run the company during Jack's illness, DVLT hired as its sales manager Sydney Eick.  In April 2016, while Jack was recovering from a cancer-related surgery, Jim and his wife Peggy—who was also a DVLT employee—attended a conference with Eick and his wife in Atlanta.  After the conference, Jack and other DVLT employees observed the attitudes and behaviors of Jim, Peggy, their daughter, Carlyn (also a DVLT employee), Eick, and DVLT's service manager, Michael Cook, becoming openly and increasingly hostile toward Jack.

In January 2017, Jack and Eick went to China to negotiate a business deal which ultimately fell through. One of DVLT's outside vendors who was present during the negotiations submitted a formal complaint suggesting that Eick had conducted himself unprofessionally and was directly responsible for the failed deal. Meanwhile, the atmosphere at DVLT continued to curdle. Jack testified that he and John Sr. attempted to meet with Jim in May and June of 2017 concerning Eick and the work environment at DVLT, to no avail. In late June, Jim, Peggy, and Carlyn were set to take a vacation. Jim suspected that Jack might, in his absence, fire Eick. So, before leaving, he expressly told his father "if Syd goes, I go."

Jim's qualms were correct. While he and his family were on holiday, Jack sought Fineburg's guidance in terminating both Eick and Cook. Fineburg referred Jack to attorney Barry Penn. On June 29, 2017, Jack executed an engagement letter retaining Penn to represent DVLT in connection with "pending employee and shareholder issues." Penn met with Jack and John Sr. that same day. According to John Sr., during this meeting, Penn asked for his position regarding Jack's decision to fire Eick and Cook, and John Sr. informed Penn that he "approved of Jack's decision to do what he had to do that was best for the company and the employees" and "supported any decision Jack made regarding whether or not Jim would continue working at DVLT." That afternoon, Eick and Cook were terminated. DVLT's locks were changed immediately following the terminations.

The next day Jim learned of the terminations and phoned Jack and John Sr. to talk about it. An argument ensued. On July 1, Penn sent Jim a letter on behalf of DVLT requesting that he "appear for a special meeting in [Penn's] office on Wednesday, July 5, 2017." It stated:

> The purpose of the meeting will be to provide you with keys to the building and to decide upon your further future involvement in DVLT. It is the hope of Jack that you will continue to be employed by DVLT for the benefit of the company and its employees.

> However, if that is not feasible then you will be treated in accordance with the terms and conditions set forth in the Shareholders' Agreement[.]

The letter also suspended Peggy and Carlyn indefinitely from their employment with DVLT.

The "special meeting" referred to in Penn's letter did not occur until July 7. The parties agree that by the end of this meeting, Jim was terminated from DVLT. The details of what happened during the meeting, however, are a matter of some debate.

In attendance were Jack, Penn, Jim, and Jim's personal attorney. John Sr. was not present. According to Jack and Penn, Jack met with John Sr. immediately before the July 7 meeting, at which time Penn understood that Jack obtained express consent from John Sr. to terminate Jim if he persisted on advocating for Eick's reemployment. Jack testified that during the meeting, Jim "kept telling me everybody's coming back in the company, there's nothing you can do about it. Told me I was going to have to get a court order to get—to keep everybody out of the company and they're going to be back there on Monday morning." As Jack would have it, because Jim would not move beyond Eick's reinstatement, he was terminated for failure to act in the best interest of DVLT.

Jim remembers things differently. According to Jim, prior to the meeting he had spoken with John Sr., who expressly told him that he had not been invited to the July 7 meeting and would not be taking sides between his sons. Moreover, at the beginning of the meeting, Penn stated that John Sr. had resigned as a DVLT director. When Jim's counsel suggested that John Sr. get involved to try and mediate the dispute between the brothers, Penn and Jack informed him that John Sr. wanted to stay out of the matter. At no point during the meeting did Jack or Penn inform Jim that John Sr. would be acting as a tiebreaker for any corporate decisions.

Jim testified that he expressed to Jack his belief that Eick was a valuable asset to DVLT,

4

but that the two did not reach a resolution as to what to do with Eick. He then asked Jack what was going on with Peggy and Carlyn, to which Jack responded: "they're fired." Jim asked what Jack was planning to do about his wife, Barbara, who was also a DVLT employee. Jack then became angry, told Penn to "do what we talked about," and walked out of the room. Jim testified that he called Jack a coward, at which point Jack stuck his head back in the room and told Jim he was fired, which conclusion was reiterated by Penn. When Jim protested, he was told that if he returned to DVLT's premises, Jack would call the police.

Shortly thereafter, Penn sent Jim's counsel a letter which confirmed Jim, Peggy and Carlyn's termination. The letter stated that Jim's "insistence on having [Eick] reinstated as an employee is a roadblock to any meaningful attempt at a resolution of the present corporate situation." It further advised that Jim, Peggy, and Carlyn were not to reenter DVLT's business premises.

On July 11, Penn advised Jim that his termination triggered Paragraph 3 of the Agreement, which establishes the buyout terms in the event a shareholder is terminated from the company:

> If the Employment of any shareholder now or hereafter employed by Corporation terminates for any reason, other than by Disability, death or Retirement, such termination, whether voluntary or involuntary, shall be treated as an offer (made on the date of termination of employment) to sell all of his Shares and any Shares previously transferred by Shareholder to a trust as permitted by Paragraph 2(c) at the Purchase Price, as determined under Paragraph 9(c), first to the Corporation and then, if required, to the Other Shareholders under the offering procedures set forth in Paragraphs 6 and 7 herein.

The letter also informed Jim that DVLT's accountant would provide him with its calculation of the purchase price of his shares. Although the parties proceeded to engage in back and forth regarding DVLT's purchase of Jim's shares, DVLT has not, to date, purchased Jim's

5

50% interest in the company.

Jim commenced this action in March of 2018. Some of Jim's claims were dismissed on Defendants' Rule 12(b)(6) motions, leaving the following: Against DVLT: Appointment of Custodian under 15 Pa. C.S.A. § 1767(a)(2) (Count I) and Involuntary Winding Up and Dissolution of DVLT under 15 Pa. C.S.A. § 1981 (Count II). Against Jack: Breach of Fiduciary Duty (Count V); Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing (Count VIII); and Waste of Corporate Assets (Count IX). Against the Law Offices of Barry F. Penn (the "Penn Firm"): Tortious Interference with Contractual Relations (Count X) and Aiding and Abetting (Count XI).

The parties entered arbitration later that year, during which DVLT sought enforcement of the Shareholders' Agreement's buyout and purchase price provisions. They filed summary judgment motions after the arbitration proceedings concluded. Shortly thereafter, DVLT informed the Court that it had just filed for Chapter 11 bankruptcy. This suit was stayed pending resolution of the bankruptcy matter, and the parties' summary judgment motions were dismissed without prejudice. The Bankruptcy Court quickly dismissed DVLT's bankruptcy petition, finding (among other things) that DVLT was in fact a solvent company and that Jack had filed the petition in bad faith. This action was then removed from the civil suspense docket and the summary judgment motions were renewed, with each party asserting entitlement to judgment on all claims.

## II. LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted). In ruling on a

summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

## III. DISCUSSION

### A. Claims Against Jack and DVLT

#### *1. Breach of Contract*

As this Court has previously recognized, the legal question at the core of this case is whether Jim's firing violated the terms of the Shareholders' Agreement. *See Meyer v. Del. Valley Lift Truck, Inc.*, 392 F. Supp.3d 483, 490 (E.D. Pa. 2019). This is a diversity action; thus, the substantive law of Pennsylvania governs Jim's claims. *See Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). In Pennsylvania, when "a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980) (quoting *East Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965)). Construction of an unambiguous contract is a job for the court. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). If, however, the contract is ambiguous, its terms are to be interpreted by the trier of fact. *Mellon Bank*, 619 F.2d at 1011 n.10. A contract's terms are ambiguous where they are reasonably susceptible to different constructions and capable of being understood in more than one sense. *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991).

The central provision of the Agreement at issue here is Paragraph 26(c) which mandates,

first, "that major decisions of the Corporation shall require unanimous consent of the Shareholders." The provision then provides a mechanism for resolving a deadlock between the brothers: If there is "a disagreement between the [brothers] that cannot be resolved," then John Sr., "who may consult with Don Fork, shall resolve the disagreement." The brothers each contend that this provision is unambiguous, with Jack arguing that its clear terms authorized Jim's termination and Jim arguing that its clear terms were breached. Because the Court finds Paragraph 26(c) ambiguous as a matter of law, the breach of contract claim will proceed to trial.

First, the phrase "major decisions of the Corporation" is ambiguous. While the parties do not seriously dispute that Jim's termination was a "major decision" given his status as a 50% owner,[1] Jim contends that all of the termination and suspension decisions leading up to his own termination—namely, the hiring of the Penn Firm, the terminations of Eick and Cook, and the suspensions of Peggy and Carlyn—were also "major decisions," such that Jack breached the Agreement by making these decisions without Jim's consent. Jack, on the other hand, contends that these decisions were made in the ordinary course of business such that he, as the President of DVLT, was authorized to act without Jim's input. The Agreement does not define or otherwise clarify the term "major decision." Although it would be reasonable to infer that the termination of any one non-shareholder employee does not constitute a major corporate decision, it would also be reasonable—given the close relationship between Jim, Eick, and Cook and the various family ties at issue—to infer that the terminations and suspensions of these particular employees were in fact major decisions.

---

[1] To the extent Jim suggests that his termination did not implicate Paragraph 26(c) because the Shareholders' Agreement does not allow for the termination of a shareholder, this argument is belied by the Agreement's provisions expressly concerning a shareholder's involuntary termination. Paragraph 3(a), specifically, contemplates the termination of a shareholder's employment "for any reason" and provides a buyout mechanism in the event a shareholder is voluntarily or involuntarily terminated.

8

The requirement that there be a "disagreement between the [brothers] that cannot be resolved" is also ambiguous. Although the record indicates that there was significant tension between the brothers—primarily concerning the continued employment of Eick—reasonable minds could disagree as to whether this tension had, by the time of Jim's termination, risen to the level of an "unresolvable" disagreement. Jack presents evidence that, prior to the July 7 meeting, Jim refused to participate in a meeting with Jack and John Sr. to discuss Eick's employment and expressly told John Sr. "if Syd goes, I go." At the same time, when Jim's counsel suggested during the July 7 meeting that John Sr. get involved to mediate the dispute, his request was refused. Moreover, pursuant to the Agreement's terms, an "unresolvable" disagreement between the brothers triggers the tiebreaking mechanism, requiring John Sr. to step in and resolve the dispute. In this case, however, Jack never informed Jim that John Sr. would be acting as a tiebreaker between the brothers. Reasonable minds could disagree as to whether a shareholder disagreement is truly "unresolvable" where one shareholder is unaware that the tiebreaking mechanism is about to be employed.

Finally, and most critically, the requirement that John Sr. "resolve" disagreements between the brothers is ambiguous. Further, as a factual matter it is unclear from the evidence whether Jack did step in to resolve any dispute. According to Jack, the Agreement does not require that John Sr. resolve the brothers' disagreement in a formal meeting, by a formal vote, or even in the presence of both shareholders. He points to various affidavits submitted by John Sr. stating that he and Jack "mutually agreed that any thought of rehiring Mr. Eic[k] was unacceptable and that if Jim insisted on his rehiring as a condition for working for the Company, he would be terminated pursuant to Section 3(a) of the Shareholders' Agreement," and that John Sr. "supported any decision Jack made regarding whether or not Jim would continue working at

9

DVLT" and "approved of Jack's decision to do what he had to do that was best for the company and the employees." In short, Jack argues that as long as John Sr. supported his actions, Jack had the requisite authority to terminate Jim.

Jim questions the credibility of John Sr.'s affidavits noting that, at the beginning of the July 7 meeting, Penn and Jack expressly informed him that John Sr. had resigned as a DVLT director; that, for health reasons, Jack did not want to get John Sr. involved in the brothers' disagreement; and that John Sr. himself wanted to remain neutral in the matter. Even assuming, however, that John Sr. did "support[] any decision Jack made regarding" Jim's future employment, there is a genuine issue of fact as to whether this "support" constituted a sufficient "resolution" of the brothers' disagreement. Given its ordinary definition, to "resolve" means "to find an answer to" or "to reach a firm decision about" an issue. *Resolve*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/resolve. Reasonable minds could disagree as to whether John Sr., by merely supporting any decision Jack was to make, reached a firm decision about the brothers' dispute. Moreover, the Agreement does not explain how John Sr. was to resolve the brothers' disagreements, except to say that he could consult with Don Fork when reaching a decision. Although Jack contends that no formal meeting or vote was necessary for John Sr. to resolve the brothers' conflict, reasonable minds could also disagree as to whether John Sr. could permissibly resolve the disagreement without attending the July 7 meeting to witness the dispute and without expressly telling each of his sons what his decision was on the matter.

In sum, because the terms of Paragraph 26(c) are ambiguous, and there is a material dispute about whether its provisions were triggered or its requirements followed, the merits of Jim's breach of contract claim must be determined by a jury.

## 2. Breach of Fiduciary Duty

In addition to his breach of contract claim, Jim brings a claim against Jack for breach of fiduciary duty. Specifically, Jim alleges that Jack breached his fiduciary duty to Jim by "freezing Jim out of DVLT, barring Jim from any participation in the Company, denying Jim of any benefits of Jim's ownership interest in DVLT and misusing DVLT's corporate benefits for Jack's benefits."

To establish a breach of fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary relationship; (2) the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of that relationship; (3) that the plaintiff suffered an injury; and, (4) that defendant's failure to act was a "real factor" in producing the plaintiff's injury. *Conquest v. WMC Mortg. Corp.*, 247 F. Supp.3d 618, 633-34 (E.D. Pa. 2017) (quoting *Dinger v. Allfirst Fin., Inc.*, 82 F. App'x 261, 265 (3d Cir. 2003)). At the threshold, Jack questions whether he owed Jim a fiduciary duty at all, contending that Pennsylvania does not recognize a fiduciary relationship between coequal shareholders.

Jack is correct, to a point: "Pennsylvania appellate courts have explicitly rejected the notion that an equal shareholder owes a fiduciary duty to a coequal shareholder." *Resh v. Bortner*, 2016 WL 4138638, at *3 (E.D. Pa. Aug. 3, 2016). But what does it mean for shareholders to be "coequal"? Clearly, shareholders are not "coequal" where one owns more shares than the other. *See Hill v. Ofalt*, 85 A.3d 540, 550-51 (Pa. Super. 2014). In this situation, Pennsylvania courts impose a duty on majority shareholders "to protect the interests of the minority" shareholder, recognizing that in the absence of this duty, majority shareholders could "us[e] their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise." *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa.

1983) (emphasis omitted) (quoting *Hornsby v. Lohmeyer*, 72 A.2d 294, 298 (Pa. 1950)).

Consistent with this reasoning, Pennsylvania courts have also found a fiduciary relationship between shareholders holding equal shares of the company, where there is other evidence indicating that one shareholder is "more powerful" or has a greater right of control over the corporate affairs. *See Hill*, 85 A.3d at 550; *Baron v. Pritzker*, 2001 WL 1855054, at *6 (Pa. Com. Pl. Mar. 6, 2001) (finding fiduciary relationship between two 50% shareholders where one shareholder had greater voting power than the other). If one shareholder has greater authority over corporate affairs, that shareholder has a corresponding duty not to abuse their authority to the other shareholder's detriment. *See Baron*, 2001 WL 1855054, at *6 ("Pritzker can dictate to Baron the manner in which the corporations are to be run. Pritzker owes fiduciary duties to Baron that prevent Pritzker from using his power in such a way as to exclude Baron from a proper share of the benefits of the corporations.").

Here, the record indicates that the brothers were coequal shareholders prior to Jim's ouster. They shared an equal stake in DVLT with each owning 50% of the company. Pursuant to the Shareholders' Agreement, they had equal voting power over major corporate decisions. Moreover, Jim testified that he and Jack had always shared "equal responsibility and authority" in running DVLT. There is no evidence that Jack exercised greater authority over DVLT's affairs than Jim prior to the latter's ouster; accordingly, there was no fiduciary relationship between the brothers during this period.

The period following the ouster is, however, a different matter. At this point, the balance of power between the brothers clearly shifted, with Jack taking sole control over DVLT's affairs. Jim contends that Jack used his greater authority to, *inter alia*, bar Jim from DVLT's premises, deny him a say in running the company, deny him access to corporate records, misappropriate

corporate funds for Jack's own personal benefit, and initiate bankruptcy proceedings on behalf of DVLT in bad faith. These actions, if proved, could constitute a breach of fiduciary duty. *See Orchard v. Covelli*, 590 F. Supp. 1548, 1557 (W.D. Pa. 1984) (breach of fiduciary duty where majority shareholder withheld dividends, withheld information relating to the corporation, and appropriated corporate assets). Jack disputes Jim's version of events—providing evidence, for instance, that Jim never attempted to return to DVLT's premises and that corporate funds were not misused—and contends that his actions were justified by Jim's alleged "disloyalty" to the company, all of which highlight that there are genuine issues of material fact as to whether Jack's conduct following Jim's termination breached a fiduciary duty.[2]

This does not end the matter, however. Jack contends that he could not have breached a fiduciary duty following Jim's termination, because Jim was no longer a lawful DVLT shareholder.[3] Jack argues that, pursuant to Paragraph 3 of the Agreement, Jim's termination triggered an offer to sell his shares to the company, which offer was accepted by DVLT. He

---

[2] Jim's claims against DVLT request the appointment of a custodian pursuant to 15 Pa. C.S.A. § 1767(a)(2) and involuntary dissolution of the corporation pursuant to 15 Pa. C.S.A. § 1981. These statutes permit courts to act where there is evidence that those in control of the corporation have engaged in oppressive conduct. *See* 15 Pa. C.S.A. § 1767(a)(2); 15 Pa. C.S.A. § 1981(a)(1). Whether to appoint a custodian or involuntarily dissolve a corporation are questions for the court to decide. *See* 15 Pa. C.S.A. § 1767(a); 15 Pa. C.S.A. § 1981(a). But, as discussed, whether Jack's actions constituted "oppressive conduct" is a question for the jury. These two claims will therefore be taken under advisement for decision after a trial on Jim's breach of contract and breach of fiduciary duty claims.

[3] Jim responds that this issue was already decided in the parties' arbitration proceedings. There, the arbitrator—without interpreting the Agreement's specific language—found that there was no offer and acceptance relating to the sale of Jim's shares. Jim contends that this finding should have preclusive effect here. Normally, "arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel." *Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir. 1999). Jim has not, however, here met his burden of establishing collateral estoppel. To establish collateral estoppel, a party must show that: (1) the issue decided in the prior adjudication is identical to the one presented in the current litigation; (2) there was a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or is in privity with a party to the prior adjudication; and, (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the question in the prior adjudication. *Id.* Jim does not mention this standard, let alone explain how its requirements are met. In any event, the arbitration decision is brief and its reasoning limited; without further information, it is impossible for the Court "to determine whether [Defendants were] precluded from a full and fair opportunity" to present their claims. *See Holtec Int'l v. ARC Machines, Inc.*, 2020 WL 5893788, at *5 (W.D. Pa. Oct. 5, 2020). The arbitration proceedings will therefore not be given collateral estoppel effect.

argues that Jim breached the Agreement's buyout provision by refusing to accept the purchase price calculated by DVLT. This argument rests, initially, on Jack's position that Jim's termination was proper. As discussed, this question is one for the jury. Should the jury decide that Jim's termination was improper, then the Agreement's buyout provision was never triggered. And, even if the jury decide that the termination was proper and that the buyout procedures of Paragraph 3 were triggered, the evidence of record is that DVLT rejected Jim's offer to sell his shares.

To see why, a closer look at the Agreement's terms and the parties' post-termination conduct is necessary. Paragraph 3 of the Agreement provides that a shareholder's involuntary termination "shall be treated as an offer (made on the date of termination of employment) to sell all of his Shares . . . at the Purchase Price, as determined under Paragraph 9(c)." Once the offer is made, Paragraph 6 provides DVLT with 30 days to accept or reject the offer. If DVLT fails to accept the offer within that 30-day period, it "shall be deemed to have rejected the offer."

On July 18, 2017—11 days after Jim's July 7 termination—Penn sent a letter to Jim on behalf of DVLT advising that the company was "exercis[ing] its option to redeem" Jim's shares. The letter provided Jim with DVLT's calculation of the purchase price of his shares based on its accountant's interpretation of Paragraph 9's purchase price formula, which provides:

> The valuation of Shares redeemed or purchased pursuant to this Agreement shall be determined by the CPA in accordance with generally accepted accounting principles, consistently applied, and shall be based upon the financial statements prepared for the fiscal year immediately prior to the offer or deemed offer pursuant to this Agreement and shall equal three (3) times EBITDA, adjusted for extraordinary items associated with the Offering Shareholder, i.e., to eliminate salary and benefits payable to such Offering Shareholder (the "Valuation"). The Purchase Price of Shares redeemed or purchased pursuant to this Agreement shall be based upon the Valuation as follows:

> . . .
>
> > (c) The Purchase Price shall be 60% of the Valuation in the event termination is due to reasons other than death, Retirement or Disability.

By its clear terms, this provision requires that the "valuation of Shares redeemed or purchased pursuant to this Agreement . . . shall equal three (3) time EBITDA, adjusted for extraordinary items associated with the Offering Shareholder." In other words, when a shareholder's termination triggers an offer to sell his shares under Paragraph 3, Paragraph 9 requires that the monetary worth of the offering shareholder's shares be determined by applying a multiplier of three to the company's Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for the prior fiscal year. The Agreement then requires that this figure—termed the "Valuation"—be multiplied by 60% to arrive at the "Purchase Price."

DVLT's accountant did not follow this formula. His first step complied with the Agreement's terms: He calculated the company's 2016 EBITDA to be $664,250 and, pursuant to Paragraph 9, multiplied this figure by three to arrive at $1,992,750, which he labeled the "total value." His second step, however, was more problematic: He halved this "total value" purportedly to account for Jim's 50% interest in the company. He labeled this figure—$996,375—the "shareholder value." Finally, he multiplied this "shareholder value" by 60%, to arrive at a purchase price of $597,825.

As Jack himself notes, it is hornbook law that "a reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counter-offer, having the effect of terminating the original offer." *First Home Sav. Bank, FSB v. Nernberg*, 648 A.2d 9, 15 (Pa. Super. 1994). Jack agrees that pursuant to the Agreement, Jim's termination (if permissible) constituted an offer to sell his shares at the purchase price specified in Paragraph

15

9(c). Although DVLT purported to accept this offer in its July 18 letter, it in fact "change[d] the conditions of the offer," *see id.*, by adding a new term, namely, that the "Valuation" be reduced by the percentage of the offering shareholder's interest in the company. The Shareholders' Agreement provides no basis for this 50% reduction in value. Rather, Paragraph 9 unambiguously contemplates only a two-step formula for arriving at the purchase price: First, the company must calculate "[t]he valuation of shares redeemed or purchased," which "shall equal three (3) times EBITDA, adjusted for extraordinary items associated with the Offering Shareholder." Second, this figure must be multiplied by 60%. By adding a new term to this formula—namely, that the "Valuation" be multiplied by the percentage interest being redeemed—the July 18 letter constituted not an acceptance of Jim's offer, but rather a counteroffer.[4]

Jim's counsel pointed out DVLT's error in a July 19 letter. He explained that pursuant to the clear terms of Paragraph 9(c), the purchase price should have been calculated by multiplying $1,992,750 (three times EBITDA) by .60, to arrive at a purchase price of $1,195,650. DVLT forwarded Jim closing documents on July 27 setting the purchase price at $597,825, without addressing the issues raised by Jim's counsel. On August 2, Jim's counsel responded, reiterating that DVLT's accountant failed to apply the purchase price formula specified in the Agreement

---

[4] Jack contends that the company's interpretation of Paragraph 9 was and remains appropriate because otherwise, a shareholder holding a 25% interest in the company would be entitled, upon his or her termination, to receive the same purchase price for her shares as a shareholder holding a 50% interest in the corporation. He suggests that this is an "absurd result." The Court disagrees. "'[I]f the plain meaning of a contract term would lead to an interpretation that is absurd *and* unreasonable,' a court may construe the contract otherwise in order to reach a more sensible and reasonable result." *Format Corp. v. Widewaters Prop. Dev. Corp.*, 162 F. App'x 168, 170 (3d Cir. 2006) (quoting *Bohler-Uddeholm*, 247 F.3d at 96). "[A] facially unambiguous term" does not, however, "become[] ambiguous if there is *any* possibly absurd result that might hypothetically occur." *Id.* at 171. Rather, to trigger this rule, "the *actual result* must be both absurd and unreasonable." *Id.* (emphasis added). In other words, in interpreting a contractual provision the court is not necessarily required to give credence to hypotheticals: Rather it looks at what actually happened. Relying on the calculation of DVLT's 2016 EBITDA provided by the company's accountant in the July 18 letter, and applying the purchase price formula provided in Paragraph 9, the purchase price for Jim's 50% interest should have been $1,195,650. While this is a significant sum, Jack provides no reason to believe that this figure is absurd or unreasonable.

and advising that Jim would not be transferring his shares. On August 11, DVLT—still relying on its erroneous interpretation of the Agreement's purchase price formula—provided a new purchase price of $636,631.20, which again was rejected. Finally, on August 21, DVLT advised Jim that the company would not be purchasing his shares under the Shareholders' Agreement.

The Agreement provided DVLT thirty days from the date of Jim's termination to either accept or reject his offer. This thirty-day period expired on August 6, 2017. At no point during this time did DVLT accept Jim's offer, that is, an offer at the purchase price arrived at by the calculation specified in Paragraph 9(c). Pursuant to the Agreement's terms, the company's failure to accept Jim's offer constitutes a rejection of the offer.[5] Thus, even assuming Jim was permissibly terminated, he was not obligated to sell his shares pursuant to the Agreement's buyout provision. Because an issue of fact exists as to whether Jack has breached a fiduciary duty to Jim, this claim will proceed to trial.[6]

### B. Claims Against the Penn Firm

Finally, Plaintiff alleges two intentional torts against the Penn Firm: tortious interference

---

[5] Paragraph 7 of the Agreement provided Jack with "a period of twenty-five (25) days following the expiration of the Corporation's thirty-day period" to accept or reject Jim's offer. Jack also failed to accept the offer within this time period.

[6] Jim's corporate waste claim will, however, be dismissed. The Complaint alleges that Jack's misappropriation of corporate funds "constitutes a waste of corporate assets that was detrimental to DVLT" which "resulted in Jim having the value of his shares in DVLT diminished" and "the loss of dividends and opportunities otherwise due to a shareholder in a Pennsylvania Close Corporation." Corporate waste is traditionally a derivative claim, *see Baron*, 2002 WL 1855054, at *4 ("A claim of corporate waste is ordinarily derivative, because the corporation is the directly injured party."), and the injuries alleged by Jim in this claim—as opposed to those alleged in his breach of fiduciary duty claim—are all derivative, *see In re Ressler*, 597 F. App'x 131, 137 (3d Cir. 2015) (Krause, J., concurring) (diminishment in the value of a shareholder's investment is a "classic shareholder claim that is barred by the derivative injury rule"). "To have standing to sue individually, the shareholder must allege a direct, personal injury—that is independent of any injury to the corporation—and the shareholder must be entitled to receive the benefit of any recovery." *Id.* at 135 (quoting *Hill*, 85 A.3d at 548). While the parties do not brief the distinction between direct and derivative claims, the Pennsylvania Superior Court has cautioned against "simply ignor[ing] the corporate form . . . to 'treat an action raising derivative claims as a direct action . . . and order an individual recovery.'" *Hill*, 85 A.3d at 556 (quoting ALI Principles of Corporate Governance § 7.01(d) (1994)). Because Jim is not entitled to personally recover for harms suffered directly by DVLT, his corporate waste claim will be dismissed.

with contract and aiding and abetting breach of fiduciary duty. Both claims are premised on steps taken by the Penn Firm to assist in terminating Jim's employment with DVLT.

In Pennsylvania, "[w]here an attorney represents a client in litigation or during arms' length negotiations, the public interest demands that attorneys, in the proper exercise of their functions as such, not be liable to adverse parties for acts performed in good faith and for the honest purpose of protecting the interests of their clients." *Smith v. Griffiths*, 476 A.2d 22, 26 (Pa. Super. 1984). Attorneys may, however, become liable for damages suffered by a third party if their "conduct is motivated by malice or if [they] commit[] an intentional tort." *Id.* "If an attorney is actuated by malicious motives or shares the illegal motives of his client, he may be personally liable with the client for damages suffered by a third person as a result of the attorney's actions." *Rapid Circuits, Inc. v. Sun Nat'l Bank*, 2011 WL 1666919, at *5 (E.D. Pa. May 3, 2011) (quoting *Naughton v. Mercy Hosp.*, 4 Pa. D. & C.4th 628, 636 (Pa. Com. Pl. 1989)).

To make out a claim for tortious interference with contract, the plaintiff must establish: (1) the existence of a contract; (2) purposeful action by the defendant specifically intended to harm the existing relation; (3) absence of privilege or justification on the part of the defendant; and, (4) actual legal damage resulting from the defendant's conduct. *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 288-89 (Pa. Super. 2010). The Penn Firm argues that Jim fails to present evidence sufficient to sustain his burden on any of these prongs. Most of these arguments need not be addressed, however, as Jim fails to offer evidence suggesting that the Penn Firm's conduct was motivated by a specific intent to harm him. *See Segal v. Strausser Enters., Inc.*, 2019 WL 2450416, at *15 (E.D. Pa. June 12, 2019) ("The second and third elements [of a tortious interference claim] are intertwined and require a showing that the

defendant acted intentionally to harm the plaintiff and that those actions were improper.").

Jim contends that he has presented evidence of "purposeful action" by the Penn Firm, to wit: (1) the July 1, 2017 letter that Penn sent to Jim advising him of Eick and Cook's terminations and notifying him that DVLT's locks had been changed; and, (2) Penn's termination of Jim during the July 7 meeting. Both of these acts were performed at the direction of Penn's client. Although Jim insists that there is an issue of fact as to whether the Penn Firm was representing Jack or DVLT at the time of Jim's termination, there is no evidence indicating that the Penn Firm intentionally misrepresented the nature of its representation. Moreover, even assuming *arguendo* that Jack's motives in terminating Jim were malicious, Jim presents no evidence that the Penn Firm was "actuated by malicious motives or share[d] [any] illegal motives of [its] client" such that it may be found liable for Jack's alleged misconduct.[7] *See Rapid Circuits*, 2011 WL 1666919, at *5. Without any evidence suggesting that the Penn Firm's actions were motivated by a specific intent to harm Jim, his tortious interference claim will be dismissed.

Jim's aiding and abetting claim fails for similar reasons. In Pennsylvania, a party is subject to liability for aiding and abetting breach of fiduciary duty "if he (1) does a tortious act in concert with the other or pursuant to a common design with him, or (2) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (3) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach to a third

---

[7] Jim offers evidence—namely, billing records from Fineburg's firm—indicating that Penn was in communication with Fineburg during the period preceding Jim's termination and for a period thereafter. Although he makes much of these interactions, he fails to show how Penn's communications with DVLT's longstanding corporate counsel indicate that the conduct of Penn and the Penn Firm was "actuated by malicious motives." *See Rapid Circuits*, 2011 WL 1666919, at *5.

19

person." *HRANEC Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Super. 2014) (quoting Restatement (Second) of Torts § 876 (1977)). Jim premises his aiding and abetting claim on the second prong, arguing that Penn substantially assisted Jim's breach of fiduciary duty.

Whether Jack did in fact breach a fiduciary duty to Jim is, as discussed, a jury question. Nevertheless, even assuming there was a breach, Jim presents no evidence suggesting that Penn knew Jack's conduct constituted a breach of fiduciary duty. Nor does he offer evidence suggesting that Penn gave "substantial assistance or encouragement to [Jack] so to" breach his fiduciary duties. *See id.* The evidence here is that the Penn Firm drafted correspondence on behalf of its client, represented its client at a meeting, and provided advice to its client. There is no evidence that the Penn Firm took "any separate, direct action . . . outside the normal course of representation" or engaged in any "long-term perpetuation of efforts to protect or contribute to [Jack's alleged] wrongful conduct" such that he could be held liable for aiding and abetting the alleged breach. *See Lhret Reading, L.P. v. Keystone Oncology Assocs., P.C.*, 2015 WL 3833856, at *4 (E.D. Pa. June 22, 2015). The aiding and abetting claim will therefore be dismissed.

An appropriate order follows.

| | |
|---|---|
| **May 13, 2021** | **BY THE COURT:** |
| | /S/Wendy Beetlestone, J. |
| | **WENDY BEETLESTONE, J.** |